# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-DP-01499-SCT

*ERIC SNOW a/k/a TONY A. HINTON a/k/a T. T. a/k/a "TONY ANTHONY HINTON"*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/06/1998 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL ADELMAN |
| | PATRICIA F. DUNMORE |
| | RICHARD BURDINE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUDY T. MARTIN |
| DISTRICT ATTORNEY: | EDDIE H. BOWEN |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 09/27/2001 |
| MOTION FOR REHEARING FILED: | 10/8/2001; denied 11/29/2001 |
| MANDATE ISSUED: | 12/6/2001 |

**EN BANC.**

**BANKS, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This appeal arises from Eric Snow's ("Snow") conviction of two (2) counts of capital murder of Deputies Tommy Bourne ("Bourne") and J.P. Rutland ("Rutland") and the subsequent sentence of death on each count. We find no error requiring reversal of the conviction or sentence. Consequently, we affirm.

## I.

¶2. These events began on February 21, 1997, when Eric Snow was sentenced to the custody of the Mississippi Department of Corrections for manslaughter and aggravated assault in Jefferson Davis County. Bourne, a jailer with the Jefferson Davis County Sheriff's office, and Rutland, a deputy sheriff, were assigned to transport Snow and Patricia Gholar ("Gholar"), another inmate, from the Jefferson Davis County Jail in Prentiss, Mississippi, to the Mississippi Department of Corrections in Rankin County, Mississippi.

¶3. As the four began their journey, Bourne drove and Rutland sat to the right of him in the front passenger seat. Gholar sat behind Rutland in the backseat and Snow sat behind Bourne. According to Gholar, somewhere in Simpson County, Mississippi, Snow fired a gun at the deputies from the backseat hitting Bourne. Snow climbed over the front seat and exited the vehicle from the front left window of the car. With the car still moving, Snow attempted to steer the vehicle while hanging in the window of the car. Gholar

testified that Snow then stood in front of the sheriff's car and she heard him fire more shots into the car. Gholar was found in the sheriff's vehicle by another witness. Deputies Bourne and Rutland were found dead in the front seat of the car. After an extensive police search, Snow was apprehended that same evening in Mendenhall, Mississippi.

¶4. In March, 1997, the Simpson County Grand Jury returned an indictment charging Snow with two counts of capital murder and one count of escape as an habitual offender pursuant to Miss. Code Ann. § 99-19-81. In June, 1997 an order allowing a transfer of venue was issued. Venue was initially transferred from the Simpson County Circuit Court to the Lauderdale Circuit Court and finally to the Lowndes County Circuit Court.

¶5. In August, 1998, after hearing testimony from Gholar, a witnesses to the incident; testimony regarding Snow's statement to police officers; a forensic scientist; and the coroner, a jury found Snow guilty of capital murder and escape from jail. Snow was adjudicated to be a habitual offender and sentenced to a penalty of five (5) years for the crime of escape. The jury also returned a verdict imposing a sentence of death for each count of capital murder.

¶6. Snow filed a Motion for Judgment Notwithstanding the Verdict and/or a Motion for a New Trial and a Supplemental Motion for Judgment Notwithstanding the Verdict and/or a Motion for a New Trial, both motions were subsequently denied after oral argument and an evidentiary hearing. Snow filed a timely notice of appeal.

## II.

¶7. On appeal to this Court convictions of capital murder and sentences of death must be subjected to what has been labeled "heightened scrutiny." Under this method of review, all bona fide doubts are to be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Balfour v. State*, 598 So.2d 731, 739 (Miss.1992) (citations omitted) (quoting *Williamson v. State*, 512 So.2d 868, 872 (Miss.1987)).[1]

## III.

¶8. In the first assignment of error, Snow submits that the trial court erred in denying his *Batson* motion because the State's use of eight out of eight peremptory challenges against African-Americans, resulting in a final empaneled jury of consisting of ten Caucasian individuals and two African-Americans, should be construed as creating a strong inference of discrimination against minority venirepersons.[2] *See Walker v. State*, 740 So. 2d 873 (Miss. 1999).

¶9. Snow asserted a *Batson* challenge during voir dire pointing out that the State used eight of its peremptory challenges against African-Americans. Without ruling on whether a prima facie case was presented, the trial court required the State to give the race and gender of challenged jurors and its reason for striking the juror. After the State articulated its reasons, the trial court ruled that the State provided race-neutral reasons for its peremptory strikes. Snow alleges that some of the reasons articulated by the State were pretextual. The State refutes this argument submitting that it provided race-neutral reasons for its peremptory challenges and, moreover, the reasons that it provided have been approved by this Court. *See generally Mack v. State*, 650 So. 2d 1289 (1994); *Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

¶10. The proper analysis for a violation pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712,

90 L. Ed. 2d 69 (1986) has been set forth by this Court in numerous cases. *See **Berry v. State***, 728 So.2d 568 (Miss. 1999); ***Randall v. State***, 716 So.2d 585 (Miss. 1998); ***McFarland v. State***, 707 So.2d 166 (Miss. 1998). The United States Supreme Court in ***Hernandez v. New York***, 500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) provided ***Batson*** requires that:

> The defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

The trial court's decision is accorded great deference on review and this Court will reverse only where the decision is clearly erroneous. ***Randall v. State***, 716 So.2d at 587; ***Collins v. State***, 691 So. 2d 918, 926 (Miss. 1997). In establishing the necessary prima facie showing of discrimination a defendant must demonstrate:

> (1) that he is a member of cognizable racial group; (2) that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race; (3) and the facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities.

***Walker***, 740 So.2d at 879.

¶11. Although the trial court did not explicitly rule whether Snow established a ***Batson*** prima facie case, the trial court required the State to provide race-neutral reasons for its challenges and because the State provided explanations for its challenges, the issue of whether Snow established a prima facie case and whether the State should be required to give race-neutral reasons for its challenges is moot. ***Mack***, 650 So.2d at 1297 (citing ***Hernandez***, 500 U.S. 352-54).

¶12. The State provided the following reasons for its strikes: (1) Annie Smith - excluded because she strongly disagreed with the death penalty and knew defense counsel, Richard Burdine; (2) Jill Renee Mann - excluded because of job and drug and alcohol rehabilitation center and presumption that she would be more "lenient and considerate of the defendant"; (3) Flora J. Stovall - excluded because prosecutor had information that a number of her family members had been arrested and convicted and she had complaints from writing bad checks; (4) Latonya Bush - excluded because related to a murder suspect who had been arrested and worked for defense attorney; (5) Diane Saffore - excluded because disagreed with the death penalty; (6) Darlene Edwards - excluded because disagreed with the death penalty; (7) Shirley Blevins - excluded because a relative was convicted of capital murder in that county and she or one of her family members was represented by defense counsel, Burdine; (8) Joyce Ann Cox - excluded because previously arrested for shoplifting. The trial court found that the reasons proffered by the State were race-neutral.

¶13. We find that the reasons articulated by the State are race-neutral. This Court has previously sanctioned these reasons. *See **Mack***, 650 So.2d at 1300 (holding that it is proper to exclude potential venire persons for criminal activity and based upon opinion of the death penalty); ***Lockett v. State***, 517 So.2d at 1351 (holding that strike based on perceived sympathy of ministers and conviction of relatives is race-neutral).

¶14. Snow urges that even though any race-neutral reason will suffice, the reason that is offered by the State must be *true. See **Hatten v. State***, 628 So.2d 294, 302 (Miss. 1993)(Hawkins C.J., concurring) (emphasis added). Snow, specifically noting the challenge to Flora Stovall ("Stovall"), maintains that the reason offered by the State for her challenge was not true as evidenced by the State's re-characterization of the challenge in argument.

¶15. The State emphasizes that the information provided by Harry Alderson, a criminal investigator with the District Attorney's Office, indicated that juror Stovall was involved with bad checks and members of her family had previous involvement with the law. The State also concludes that because the trial judge's ruling was not clearly erroneous or against the overwhelming weight of the evidence, Snow's argument is without merit.

¶16. The following exchange took place regarding the alleged check complaints against Flora Stovall:

BY THE COURT: . . .Repeat No. 14, Flora J. Stovall.

BY MR. FORTENBERRY: Either I asked Mr. Alderson or DeForrest Allgood, but those are my reasons for Flora Stovall was that a number of those family members had been arrested and convicted is my recollection.

BY MR. WEBB: Also in the bad check

BY MR. FORTENBERRY: And problems in the bad check unit, and that's what I'm relying on.

BY THE COURT: I'd like you to inquire from Mr. - -we are looking at No. 14 Flora Stovall.

BY MR. ALLGOOD: I don't recall being asked about Ms. Stovall, Your Honor, but I can tell the Court that there is a Joe Nelson Stovall that even now is in the Lowndes County Jail. He is a mental case.

BY THE COURT: Well, now, this is kind of after the fact. Don't give us anything like that. I want to know what you told Mr. Fortenberry.

BY MR. ADELMAN: This is outrageous.

BY THE COURT: Well, y'all need - -

BY MR. FORTENBERRY: - - I was told a number of family members were arrested and convicted - -

BY THE COURT: Okay. All right.

BY MR. ADELMAN: He doesn't recall being asked about it.

BY MR. FORTENBERRY: - - and I said for the record it was either Mr. Alderson or Allgood. I don't recall which one.

BY MR. ADELMAN: You may take offense, but I find striking seven out of seven jurors outrageous. I don't care. And you can say that there's these reasons, but you know the statistical probability is incredible. I'm making a record of this.

BY THE COURT: Please do.

BY MR. ADELMAN: And I am mightily objecting to it. I don't believe that there was any basis for striking Ms. Stovall. You indicated that you had information. The District Attorney is here, and he says he doesn't recall.

BY THE COURT: Well - -

BY MR. FORTENBERRY: Judge, it was the District Attorney's office. The person I worked with last week was Mr. Alderson.

BY THE COURT: All right. And at my request, Mr. Alderson has come over. Now, Mr. Alderson tell us what you told Mr. Fortenberry about Flora J. Stovall, if anything.

BY MR ALDERSON: We have had several Stovalls from the Artesia area, which one was Joe Nelson, like DeForrest said, also Russell Stovall.

BY THE COURT: Now, is this what you told Mr. Fortenberry?

BY MR ALDERSON: Yes, sir, And I - - is this one also that's in the check unit? I'm not sure if this was.

BY MR. WEBB: That was the information we received.

BY MR ALDERSON: For the record's sake, Harry Alderson is criminal investigator with the D.A.'s office for the Sixteenth Circuit Court District.

BY THE COURT: Thank you. I appreciate that. I neglected to put it in there. Are you representing to us that you have in the past or currently complaints regarding bad checks against Flora J. Stovall?

BY MR. ALDERSON: Yes, sir. That's what records indicate in our check unit, yes, sir.

BY THE COURT: All right, Then I'll accept that and allow that strike.

¶17. In *Hatten*, this Court, addressing whether a trial judge is required to make an on-the-record factual determination of race-neutral reasons cited by the State for striking venire man from a panel, prospectively held that trial courts should make on-the-record factual determinations of race-neutral reasons. *Id.* at 298. In making this determination, this Court observed that the trial judge in *Hatten* "did not merely accept the specific reasons given by the prosecution at face value, but considered whether they were contrived. *Id.* at 299. The Court also held that findings of the trial court that explanations given for peremptory challenges were race-neutral will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence. *Id. Hatten* does not require literal truth in the reason proffered. It only requires that there be some basis in fact sufficient to allow the court to make a reasonable judgment that it is not contrived.

¶18. Here, the State offered a race-neutral reason for its strike against Ms. Stovall. The trial court, in response to Snow's uncertainty regarding the charges, required Allgood and Alderson from the District Attorney's Office to verify the prosecutor's statement. The determination of credibility is within the

discretion of the trial court. ***Davis v. State***, 767 So.2d 986, 995 (Miss. 2000)(on review, the trial court's determinations under ***Batson*** are afforded great deference because they are, in large part, based on credibility); ***McGilberry v. State***, 741 So.2d 894, 923 (Miss.1999) (citing ***Coleman v. State***, 697 So.2d 777, 785 (Miss.1997)). The trial court examined the reason given by the Fortenberry and made an on-the-record factual inquiry and determination the prosecutor received the race-neutral information upon which he relied. Therefore, we find this argument is without merit.

¶19. Snow, citing ***Randall v. State***, 716 So.2d at 588, urges that the third prong of ***Batson*** requires a determination of whether the opponent of the strike has carried his overall burden of proving purposeful discrimination. This Court has opined that the determination of whether the race-neutral reason is pretextual hinges upon:

> . . . on a host of case specific findings which are similar to those employed at step 1: the extended nature of voir dire on the grounds upon which the strike is exercised; the relation between the reasons for the strike and the facts of the case; the demeanor of the attorney and the perspective jurors; and, disparate impact upon a minority or gender.

***Id.*** Snow also posits that in ***Randall***, this Court provided:

> Additionally, this Court has recognized that the relative strength of the *prima facie* case of purposeful discrimination established at step one will often directly color the inquiry into whether any given reason is mere pretext, "The stronger the *prima facie* case, the more cogent the explanations from the state and supporting evidence must be and vice versa." ***Mack***, 650 So.2d 1298. Just as in step one, these fall squarely within the bailiwick and expertise of the trial court judge, who will not be reversed except on a showing of clear error.

***Randall***, 716 So. 2d at 588 (citations omitted).

¶20. Snow submits that unlike the facts presented in ***Mack***, the prima facie case is strong in the instant case. In ***Mack,*** the State used four out of its twelve challenges against African-Americans. 650 So. 2d at 1295. The seated jury included nine African-Americans and three Caucasians, ending in a jury that was seventy-five percent African-American. ***Id.*** Four alternates were chosen; three of whom where African American. ***Id.***

¶21. Snow stresses that, here, only two of the twelve jurors seated were African-American, which means that the jury was less than seventeen percent African-American. He points out that the venire selected for the jury was approximately forty-six percent African-American based on the jury questionnaires included in the record. Snow also urges that the State only used eight strikes during the selection of the seated jury and each of these strikes was against an African-American person. Snow concludes that these facts support a strong prima facie case of an intent to discriminate against African-American venirepersons, thus, the State has the burden of providing a cogent explanations for its strikes.

¶22. Snow cites to ***McFarland v. State***, 707 So.2d at 172, where this Court upheld the State's ***Batson*** challenge when the defendant used all of its peremptory strikes on white jurors. In ***McFarland***, this Court held "that a party may attempt to refute the other party's race-neutral reason by pointing out that similar claims can be made about non-excluded jurors." *See also* ***Berry***, 728 So.2d 568.

¶23. Snow avers that his argument, that the State's peremptory challenges were racially motivated and the

reasons offered by the State pretextual, is supported by the alleged reasons offered by the prosecution for striking venireperson Stovall. This exchange, Snow alleges, indicates that Alderson was prompted by the District Attorney to state that Stovall had complaints against her for writing bad checks. Further, Snow contends that the prosecution did not produce any records to establish that there were bad check charges against Stovall.

¶24. Snow also charges that the prosecutor's intent to discriminate on the basis of race was highlighted during the post-trial motions where the prosecutor allegedly argued that he struck African-American jurors because they would vote against the death penalty; not because of bad checks or family members.

> BY MR. FORTENBERRY: As far as *Batson* goes, the State struck eight jurors it believed that weren't in favor of the death penalty. And Mr. Adelman says he stunned that we struck eight jurors who were black or African American who we felt like would not vote for the death penalty.

¶25. Both of the reasons posited by the State for striking Stovall were race-neutral under legal precedent of this State. *Magee v. State*, 720 So.2d 186, 189 (Miss. 1998)(striking a juror because of the conviction or charge of a family member is a valid, race-neutral reason); *Mack v. State*, 650 So.2d at 1299-1300 (striking a juror because of prior history of writing history is race-neutral reason).

¶26. It was not necessary to produce records of Stovall's complaint in the bad check unit. This Court, in discussing the prosecution's reliance on information supplied by the police, has stated:

> We decline to set any limits on the prosecutor's use of any legitimate informational source heretofore or hereafter available as to jurors. Furthermore, the prosecutor does not have to question a juror in open court about such information before using it as a racially neutral ground to make a peremptory strike, as long as the source of the information and the practice itself are not racially discriminatory.

*Brown v. State*, 749 So.2d 82, 87 (Miss. 1999) (citing *Lockett*, 517 So.2d at 1352).

¶27. The State notes that 1) it had four remaining peremptory challenges that it did not utilize; 2) two African-Americans were seated on the jury; 3) the reasons given for exercising the eight strikes have been approved by this Court; and 4) Snow did not raise any evidence of discriminatory intent on the part of the State.

¶28. We have noted that the acceptance of other African-American as jurors is no defense to a *Batson* claim. *Conerly v. State*, 544 So.2d 1370, 1372 (Miss. 1989). The pivotal issue here becomes not whether the State used all of its peremptory challenges against African-Americans, nor whether there where two African-Americans on the jury, but whether we may disturb the trial court's finding that the State did not use its peremptory challenges in a discriminatory manner against African-American venirepersons. *See Govan v. State*, 591 So.2d 428, 430 (Miss. 1991); *Sudduth v. State*, 562 So.2d 67 (Miss. 1990) (holding that is not the fact that a jury is all white or all black that violates *Batson*; rather, it is the racially discriminatory use of peremptory challenges to strike jurors). We answer this question in the negative.

¶29. Our review of the record reveals that none of the unchallenged jurors of the opposite race, in general, share any of the characteristics given as a basis for the challenges.

¶30. Snow does have a strong prima facie case of discrimination. This Court has stated that the "the stronger the *prima facie* case, the more cogent the explanations from the state and supporting evidence

must be and vice versa." *Mack,* 650 So.2d at 1297 (citing *Ex Parte Bird & Warner*, 594 So.2d 676 (Ala. 1991)). Here, the seated jury was less than seventeen percent African-American out of a venire that was at least forty-six percent African-American. The State used eight out of eight peremptory challenges against African-Americans; meaning the State used all of its peremptory challenges against African-Americans. The defendant was African-American and the victims were two Caucasian law enforcement officers. Thus, the race-neutral reason should clearly be supported. *See id.* (stating that where the reasons are facially race neutral, however, a weak or non-existent prima facie case weighs against the finding of pretext).

¶31. Nevertheless, this Court has held that writing bad checks is a race-neutral reason as provided in *Mack*. *Id.* at 1298. The trial court evaluated the challenge and questioned the prosecutor, the district attorney, and the district attorney's investigator regarding Stovall having complaints in the bad check office and whether her family was involved in criminal activity. The court then made a determination regarding the merits of the race-neutral reason and accepted the peremptory challenge. The trial court throughly investigated the race-neutral reason in order to make a determination of whether or not the reason was pretextual and concluded that this reason was clearly supported from the testimony of the investigator.

¶32. We conclude that Snow has failed to establish that the court erred in overruling his *Batson* motion. Accordingly, we hold that this assignment of error is without merit.

## IV.

¶33. Snow asserts that the racial and gender restrictions on peremptory challenges from *Batson* and its progeny are not enforceable under the three-step analysis provided by *Batson,* and, therefore, that the appropriate remedy is the abolition of peremptory challenges.

¶34. Snow did not raise this argument at trial. This issue is, therefore, procedurally barred and is not properly before this Court. *Ellis v. State*, 469 So.2d 1256, 1260 (Miss. 1985). This Court has held that a party who fails to make a contemporaneous objection at trial must rely on plain error to raise the issue on appeal. *Foster v. State*, 639 So.2d 1263, 1288-89 (Miss. 1994). This Court applies the plain error rule only when it affects a defendant's substantive/fundamental rights. *Grubb v. State*, 584 So.2d 786, 789 (Miss. 1991).

¶35. No court, this Court included, has held the allowance of peremptory challenges to be unconstitutional despite the argument made by Justice Marshall in *Batson* to that end and we decline to take that opportunity here, where the issue is presented for the first time on appeal. *See Batson*, 476 U.S.at 104 (Marshall, J., concurring)(writing that peremptory challenges should be eliminated in order to end racial discrimination in the jury-selection process because *Batson* could not do so alone).

## V.

### a.

¶36. Snow contends that a mistrial should have been declared after an emotional outburst by members of the victims' family.

¶37. Citing to *Fuselier v. State*, 468 So.2d 45 (Miss. 1985) and *Stringer v. State*, 500 So.2d 928 (Miss. 1986), Snow argues that this Court reversed that defendant's sentence on the grounds that "the

combination of argument and trial tactics by the prosecutor was sufficient to inflame and prejudice the jury in its deliberations on the death penalty." *Id.* at 930. Snow contends that the prosecutor decided to intentionally "ratchet" up his closing argument inviting the emotional outburst from the gallery. Snow recognizes that this Court has upheld the denial of a mistrial on the basis of an emotional outburst during trial, when that outburst occurred at an early stage of the trial and was unprovoked by either party. *Bell v. State*, 631 So.2d 817 (Miss. 1984). Here, the opposite is true Snow argues, the emotional outburst was anticipated and provoked by the prosecutor. Further, because the emotional outburst occurred during the closing argument, Snow alleges that he had little opportunity to counter the prejudice caused by the emotional outburst.

¶38. The State points to the record where the emotional outburst occurred:

> BY MR. FORTENBERRY: . . . I've always said you never talk about somebody until you've walked in their shoes (showing exhibit), and I don't know what it's like to walk in law enforcement shoes, but those are the shoes of Tommy Bourne.
>
> (Outburst in courtroom.)
>
> BY THE COURT: Let's have order. Just a minute, Mr. Fortenberry. Let's clear the courtroom.
>
> BY MR. ADELMAN: I have a motion, Your Honor.
>
> BY THE COURT: Ladies and gentlemen, I ask you to retire to your jury room briefly, please.

Snow then moved for a mistrial alleging that the prosecutor's argument was calculated to produce a strong reaction and that in order to deter that type of response the prosecutor should have warned the victim's family of the emotional nature of the argument beforehand. In overruling the motion for mistrial, the trial court stated:

> BY THE COURT: Very well. All right. The motion for mistrial will be overruled, and unless the defendant requests me not to, I will remind the jury that they have been instructed not to be swayed by passion, sympathy, etc., and I will ask them each if they will -- can and will disregard the emotion they observed.
>
> I will also instruct counsel for both sides to advise family members that if they have any problem whatsoever, whatsoever in the least with restraining their emotions, to stay out of the courtroom. Should a second outburst occur, I will have some serious consideration to do.
>
> I will also advise the audience now we are pleased that you are here to watch this trial. Trials are open to the public by our Constitution and citizens are encouraged to come and view the judicial process in progress. However, with that freedom comes responsibility, and that is to obey the directives of the Court and to maintain proper demeanor and decorum while in the courtroom.
>
> Now, I said that to say this. If anyone whatsoever thinks they will have trouble controlling their emotions from this point until the jury is discharged or until Court is adjourned, excuse yourself now and do not return. Any person making any sound whatsoever from this courtroom will be found in contempt and placed in custody until further order of the Court.

Now, if there's any problem anyone has understanding that, ask one of the lawyers. They will explain it to you. If you have any problem whatsoever with controlling your emotions, leave now, please, and do not return.

Now, we are going to take about five or ten minutes, Mr. Fortenberry and defense counsel, and ask you to explain that to your respective parties.

Court is in recess.

Upon the jury's return the trial court questioned the jury regarding the emotional outburst:

BY THE COURT: Ladies and gentlemen, you were instructed earlier that you are not to decide this case based on sympathy or passion. Now, I am reminding you now of that instruction. As you saw a few moments ago, a member of the audience left the courtroom crying audibly. You are required by law and the instructions of the Court to ignore that emotional outburst.

Now, can each of you promise us all that you can and will ignore that outburst?

(Affirmative responses)

And the back row?

(Affirmative responses)

Very Well.

Madame Court Reporter, let the record reflect that each juror individually assented thereto.

BY THE COURT: Mr. Fortenberry, you may continue.

¶39. The State asserts that *Fuselier* and *Stringer* are distinguishable from the instant case and the clear precedent on emotional displays was set forth in *Bell v. State*, 631 So.2d at 819-20. In *Fuselier,* the victim's daughter was allowed to sit within the rail of the courtroom and at the prosecutor's table. *Fuselier,* 468 So.2d at 52. The State notes that the victims' family did not sit at the prosecutor's table in the instant case. In *Stringer,* this Court listed a cumulation of errors which required reversal. *Id.*[(3)] The State charges that none of the errors listed occurred in the instant case, therefore, *Stringer* is inapplicable to the case at hand.

¶40. In *Bell*, the victim's mother jumped up during testimony by a State's witness and said twice "Cold blooded killed my child." *Bell*, 631 So. 2d at 819. The trial court excused the jury from the jury room and heard arguments on the defendant's motion for a mistrial. *Id.* The trial judge cautioned the spectators against future outbursts and asked the bailiffs to speak to the family members to ensure that there would be no more outbursts. *Id.* at 820. The jury was returned to the courtroom and polled. Each juror indicated that they could disregard the outburst. *Id.* The jury was also instructed to disregard the outburst. *Id.* In *Bell* this Court reasoned:

Any harm flowing from the woman's outburst was removed by the trial judge's proficient handling of the matter. The judge sua sponte ordered the jury out of the courtroom immediately after the remarks were made. Once order was restored to the courtroom, the judge questioned the jury to determine if

each could disregard the comments. This Court has held that it must be presumed that the jurors followed the court's admonition to disregard the unanticipated, unprovoked incident and to decide the case solely on the evidence presented; to presume otherwise would be to render the jury system inoperable. *See Wright v. State*, 540 So.2d 1, 4 (Miss.1989); *Hunt v. State*, 538 So.2d 422, 426 (Miss.1989); *Johnson v. State*, 475 So.2d 1136, 1142 (Miss.1985). Accordingly, this assignment of error is without merit.

631 So. 2d at 820.

¶41. Snow argues that *Bell* is factually inapposite because the emotional outburst occurred at an early stage of the trial. *Id.* Snow insists that the fundamental difference is that here the outburst occurred at the latter stages of the trial, leaving little opportunity to counter the possible prejudicial effect of the outburst. The prosecutor's statements, Snow urges, were reasonably calculated to unduly influence the jury and prejudice the defense. Because this Court has long held that a prosecutor's closing remarks constitute reversible error where they are designed to appeal to "bias, passion, or prejudice," Snow contends that this Court should find reversible error in the instant case.

¶42. The applicable standard of review for denial of a motion for mistrial is abuse of discretion. *McGilberry v. State*, 741 So.2d at 907. This Court has held that a mistrial is reserved for occasions where the trial court can take no action to cure the improper occurrences. *Walker v. State*, 671 So.2d 581 (Miss. 1995). In *Walker*, this Court stated:

> Elementary to all trial proceedings is the proposition that the occurrence of any prejudicially incompetent matter or misconduct before a jury, the damaging effect of which cannot be removed by admonition or instructions, necessitates a mistrial. However, it is the well established rule in Mississippi that where a trial judge sustains an objection to testimony interposed by the defense in a criminal case and instructs the jury to disregard it, the remedial acts of the court are usually deemed sufficient to remove any prejudicial effect from the minds of jurors.

*Id.* at 620 (citations omitted).

¶43. There was no abuse of discretion in denying the motion for mistrial. The record does not support, nor indicate how this emotional outburst prejudiced Snow to a degree that a mistrial was warranted. Even under the high standard necessitated by the death penalty Snow has failed to show how this outburst prejudiced this proceeding. *See Drane v. State*, 523 S.E.2d 301, 305 (Ga. 1999)(holding trial court's curative instructions adequately prevented error from arising due to spectator's emotional outburst during State's closing argument in guilt/innocence phase of capital murder prosecution); *Lowe v. State*, 478 S.E.2d 762 (Ga. 1996)(holding defendant not entitled to mistrial after emotional outburst during state's closing argument, where the court gave curative instructions to disregard incident as irrelevant to case).

**b.**

¶44. Snow also alleges that a note received from the jury during sentencing deliberations indicated the jury's bias against him. The note from the jury stated:

> We the jury are concerned with our safety of Eric Snow's family. They were seen when we went to lunch at the hotel; and they followed us back to courtroom I hope that you guys keep us in Good hands. The Jury.

After reading the note, counsel for Snow moved for a mistrial arguing that there was no evidence justifying the jury's concern regarding the Snow family. Snow reasons that the note goes to the very heart of the issue as to whether or not the jury verdict was based on evidence and not affected by extraneous influences. *See Fuselier v. State*, 468 So.2d at 57. As the defendant is entitled to have the jury consider any aspect of his character or record as a basis for mitigation in a death penalty case, Snow surmises that it is obvious from the note sent by the jury that the jury did not consider or was biased when considering the mitigating factors.

¶45. He asserts that the issue is not whether the jury was properly instructed on the mitigating circumstances, but whether the note caused such blind prejudice on the part of the jury that the jury was unable to consider the mitigating circumstances presented on his behalf.

¶46. The record shows that the jury sent out the note at 4:30 p.m. and the judge responded to the note at 4:38 p.m, stating "When you are ready to make a report, please advise your bailiff. Robert G. Evans, Judge, 6 Aug. 98 4:38 p.m." The State then points out that the jury returned its verdict at approximately 4:40 p.m., two minutes later. This evidence, the State asserts, indicates that the jury had already reached its verdict and was merely concerned about its safety after the verdict was returned in open court.

¶47. Snow's argument is without merit. The fact that the jury sent out a note concerning its safety, regardless of the Snow family's impeccable behavior simply does not imply that the jurors were biased when considering Snow's mitigating circumstances. It is clear from the verdict that the jury found those circumstances unavailing to Snow. An expression of apprehension concerning the affect of its decision upon defendant's family does not indicate that the circumstances were not considered. There is nothing to indicate that the jury failed to consider the mitigating circumstances before its verdict.

**c.**

¶48. Subsequent to the trial, Snow filed a Supplemental Motion For Judgment Notwithstanding the Verdict alleging that there was evidence of improper outside contact between Juror Rolander Evette Brooks ("Brooks") and one or more members of that juror's family. Snow attached affidavits from Joyce Snow, Snow's mother, and his aunt, Eloise Bridges, stating juror Brooks's sister informed them that Brooks's father spoke with juror Brooks about Snow's sentencing.

¶49. During the post-trial hearing, Sandra Brooks Neal ("Neal"), the sister of Juror Brooks, testified that she did not have any contact with her sister during the trial, even though she admitted to having a conversation with Joyce Snow and Eloise Bridges. She testified that she did not initiate the conversation and either Bridges or Joyce Snow asked her about Brooks being on the jury.

¶50. Snow points out that Eloise Bridges' testified that Neal informed them that Neal and Brooks's brother was in trouble and possibly on his way to Parchman. Juror Brooks confirmed that her brother had been in trouble with the law when she testified. Snow indicates that both Bridges and Joyce Snow testified that they did not have any knowledge about Brooks's brother before the conversation. Snow argues that this information supports the argument that the conversation took place between Joyce Snow, Bridges, and Neal.

¶51. Neal testified that she never met or talked with Juror Brooks during the trial. She further testified that she left Brooks at the hotel on Monday evening, when Brooks initially reported for jury sequestration, and

did not speak to Brooks again until the conclusion of the trial.

¶52. Juror Brooks testified that after she was sequestered she did not talk with anyone about the trial while it was in progress. She also stated that the phone in her hotel room was disconnected, and her father and sister did not come to her hotel room. She did testify that during the trial, she needed some toothache medicine. She stated that the bailiff contacted her father and had her family deliver the medicine to the courthouse.

¶53. The trial judge in reviewing the motion concluded:

It's my finding that the conversation in question never went further than that described by Ms. Sandra [Brooks] Neal and that no one contacted Juror Rolander Evette Brooks other than court personnel authorized to do so, specifically I'm referring to the bailiffs, and that Juror Brooks was not subjected to any outside influences whatsoever. However, even if we stick our necks way out and assume for the sake of argument that the conversation did take place as described by Ms. Snow and even if we further go out on the limb of assumption and assume that Lieutenant Brooks and Sandra Neal did visit Rolander Evette Brooks and had a conversation with her about the death penalty, the bend of that conversation stressed opposition to the death penalty; thus, the outside influence would have been beneficial to the Defendant, and certainly, he cannot take advantage of that. So, your motion is denied.

¶54. In *Lewis v. State*, 725 So.2d 183, 190 (Miss. 1998), this Court held:

. . . there must be sufficient proof of an alleged outside influence. *See King v. State*, 580 So.2d 1182, 1187 (Miss. 1991); *Williamson*, 512 So.2d at 882; *Carter v. State*, 493 So.2d 327, 329 (Miss. 1986). In this case, the proof is very limited as to whether outside information was considered by the jury in rendering its decision. "A mere possibility that [an improper] influence might have been used ... is not sufficient to justify setting aside this conviction." *Pepper v. State*, 200 Miss. 891, 27 So.2d 842, 843 (Miss. 1946).

¶55. We conclude that the trial court did not err in denying Snow's motion. After the motion was made, the trial court conducted a post-trial hearing and listened to the testimony presented by Joyce Snow, Bridges, Neal, and Brooks. Even in light of the high threshold in the standard of review for death sentences, we see no basis to disturb the trial court's finding that there is insufficient proof of improper influence on the jurors while they were deliberating.

## VI.

¶56. Snow contends that the trial court failed to properly evaluate his competency to stand trial. Counsel for Snow filed an Affidavit in Support of the Motion to Determine Competency in camera under seal, advising the court that Snow was unable to effectively assist his attorneys and counsel had no confidence that Snow could make an intelligent, informed and realistic decision as to whether he should testify in his defense. The initial motion to determine competency was filed in November, 1997. The Affidavit in Support of Motion to Determine Competency was filed under seal in February, 1998. After several hearings, the trial court denied this motion in April, 1998. The trial court entered an Order Granting Observation and/or Evaluation in June, 1998. Snow filed a Renewed Motion to Determine Competency and a Motion to Reconsider Order Granting Observation in June, 1998. In July, 1998 Snow filed a Motion to Prohibit Chris Lott, Ph.D.

From Conducting Further Evaluations of Defendant or Interviewing Extrinsic Witnesses; Quash Subpeonas, or, In the Alternative, Motion in Limine. The trial judge entered an Order Terminating Observation and/or Evaluation and an Order Denying Renewed Motion to Determine Competency in July, 1998. Snow initially refused to meet with the clinical psychologist, Dr. Goff.

¶57. In March, 1998, Snow finally met with Dr. Goff in the Simpson County Jail in Mendenhall, Mississippi. Dr. Goff diagnosed that Snow may be suffering from a delusional order or schizophrenia. Dr. Goff suggested that Snow be sent to a facility where he could be observed in a control setting and opined that this type of observation could not be conducted in the Simpson County Jail.

¶58. Instead, Snow argues, the trial court's order of June, 1998, granting observation only provided for observation and evaluation at the Simpson County Jail. Further, Snow charges, the order was not consistent with Dr. Goff's recommendation that the observation take place another facility and allowed the State's psychologist, Dr. Lott, to interview Snow at the Simpson County Jail. Snow urges that Dr. Lott was only viewed as an agent of the State by Snow, therefore, in July, 1998, at the request of Snow, the trial court entered an Order terminating the evaluation.

¶59. Snow suggests that the trial court did not fulfill the requirements set forth by this Court in *Howard v. State*, 701 So.2d 274, 279-84 (Miss. 1997) and *Conner v. State*, 632 So.2d 1239, 1248-1251 (Miss. 1993). In *Howard*, Snow notes that the test for competency to stand trial mandates that a defendant is one who is:

> (1) who able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) who's ability to satisfy the foregoing criteria is commensurate with the severity of the case.

*Howard*, 701 So.2d at 279.

¶60. Applying these criteria to Snow, his counsel stresses that: 1) Snow exhibited limited, if any, ability to perceive and understand the nature of the proceedings; 2) he exhibited no ability to rationally communicate with his attorney's about the case; 3) he gave no indication that he had any ability to recall relevant facts; 4) he exhibited no ability to make a rational determination as to whether or not testimony in his own defense would be appropriate; and 5) since this is a death penalty case, competency should be given the highest possible scrutiny.

¶61. The standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960). The procedures which govern a competency determination were set forth in *Emanuel v. State*, 412 So.2d 1187, 1188-89 (Miss.1982). *See also* Uniform Rule of Circuit and County Court Practice Rule 9.06 (1996). In *Emanuel*, this Court held:

> When the trial court has made a finding that the evidence does not show a probability that the defendant is incapable of making a rational defense, we will not overturn that finding unless we can say, from the evidence, that the finding was manifestly against the overwhelming weight of the evidence. The evidence must show more than a possibility that defendant is incompetent to stand trial-

the evidence must go further until it appears to the trial court that there is a probability that defendant is incapable of making a rational defense. In this initial inquiry, the trial judge must weigh the evidence and be the trier of the facts.

*Emanuel*, 412 So.2d at 1189.

¶62. The State stresses that the record reflects that a competency hearing was held on April 3, 1998. Dr. Lott testified that he had interviewed Snow on September 12, and September 21, 1997 and was of the opinion that Snow was competent to stand trial. Dr. Lott also stated that, in addition to the ability to confer with his attorneys, Snow had a working knowledge of the legal process and exhibited "street savvy." He testified that Snow understood that he faced charges of capital murder and escape and also understood how the trial would work. Finally, Snow told Dr. Lott that he trusted and could work with his attorneys.

¶63. The State submits that Snow did not in any way refute the finding by Dr. Lott. *See generally Evans*, 725 So.2d 660 (holding that the State does not have to prove a defendant's competency to stand trial). Moreover, the State urges that in finding Snow competent to stand trial, the trial court clearly considered: the findings of Drs. Lott and Goff; the affidavit submitted by Adelman; Snow's behavior and appearance in the courtroom; and conversations on the record with Snow in which Snow demonstrated a clear understanding of his right and need of legal counsel. Also, the State contends, the trial judge made a finding of fact that Snow was "capable of understanding these proceedings. . . he understands them better than the average layman, but he is capable of appreciating their significance, and he is capable of consulting with his attorneys in formulating and assisting in his defense . . . Mr. Snow is competent to stand trial."

¶64. There is nothing in the record to indicate that the trial court abused its discretion or that the determination of competency was against the overwhelming weight of the evidence. *Dunn v. State*, 693 So.2d 1333, 1341 (Miss. 1997). The conflict in the evidence presented was whether Snow "could or simply chose not to rationally confer with counsel and aid in his own defense." This type of conflict, is properly resolved by the trier of fact. *See Evans*, 725 So.2d 663.

¶65. Snow erroneously relies on *Howard*. In *Howard,* this Court was faced with a situation where the trial court failed to order a competency hearing before allowing a defendant to represent himself in a murder prosecution. *Howard*, 701 So.2d at 280. This Court in noting the trial court's ongoing responsibility to prevent the trial of an accused unable to assist in his own defense, held that a defendant must be able to meet the standard of competency before it can be said that the defendant is capable of intelligently and knowingly waiving the right to counsel. *Id.* The Court then set forth the standard articulated by Snow in his brief.

¶66. We are not faced with a situation where Snow waived his right to counsel. As a matter of fact, the record indicates that Snow was persistent and particular about who would represent him at trial by requesting on different occasions new counsel. Further, this is not a situation where there was no competency hearing to determine whether the defendant was able to stand trial. The trial court conducted a competency hearing and determined that Snow was competent to stand trial. That finding was based upon evidentiary support and is not clearly erroneous. Consequently it will not be disturbed.

## VII.

¶67. Snow argues that the photographs in Exhibit S-33, which were admitted over his objection, had no

more probative value than the other photographs which were proffered by the State and excluded by the trial judge.[(4)] Snow alleges that Exhibit S-33 presented no probative value in light of the fact that cause of death, location of the victim or identity of the victim were at issue. He cites to this Court's reasoning in *Sudduth*, where the Court stated:

> However, photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established.

*Sudduth*, 562 So.2d at 69. Snow submits similar to *Sudduth*, none of those issues identified were at issue in this trial. Snow concludes that these admissions constitute harmful and prejudicial error requiring reversal.

¶68. Photographs which are gruesome or inflammatory and lack an evidentiary purpose are always inadmissible as evidence. *Mackbee v. State*, 575 So.2d 16, 31 (Miss.1990) (quoting *McNeal v. State*, 551 So.2d 151, 159 (Miss.1989)). This Court has stated that when deciding on the admissibility of gruesome photos, trial judges must consider whether the proof is absolute or in doubt as to identity of the guilty party whether the photos are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury. *Holland v. State*, 587 So.2d 848, 864 (Miss.1991) (quoting *McNeal*, 551 So.2d at 159). The decision of whether to admit photographs is within the sound discretion of the trial court. *Mackbee*, 575 So.2d at 31. Some 'probative value' is the only requirement needed to buttress a trial judge's decision to allow photographs into evidence. *Holland*, 705 So.2d at 350 (quoting *Parker v. State*, 514 So.2d 767, 771 (Miss.1986)).

¶69. The trial court did not abuse its discretion in admitting S-33. Although the photograph in question does show some blood on the victims, the photograph is not so gruesome or inflammatory as to require reversal. Moreover, the photograph shows the position of the victims in the car, but does not depict the wounds from the gun as graphically as the other exhibits.

¶70. The trial court found that the photograph was probative in establishing the location of the bodies and admitted it for that purpose. Melissa Schoene, a forensic scientist who investigated the crime scene, testified to the position of the car and the bodies after the shooting. In light of the discretion given to the trial court, the trial court did not err in admitting State's Exhibit 33.

## VII.

¶71. Snow argues that the State's elected to indict him as a habitual offender it should be barred from seeking the death penalty. Because Miss. Code Ann. § 99-19-81 (2000)[(5)] does not provide for the death penalty, as a matter of double jeopardy, he insists he could not be sentenced under both Section 99-19-81 and Miss. Code Ann. § 99-19-101 (2000). We find nothing improper in the habitual offender language in the indictment. This argument is specious.

¶72. Snow cites *DeBussi v. State*, 453 So. 2d 1030 (Miss. 1984) which he contends held that sentencing under both the habitual offender and death penalty statues constitutes double jeopardy. In *DeBussi,* this Court said:<

> The alternatives in a capital sentencing trial are death or life imprisonment, and the jury is guided by specific statutory standards as to which should apply. Under Mississippi's habitual offender's statutes, if the convictions be properly proven the trial court has not alternative but to impose the sentence

prescribed in the statute. The habitual offender sentencing hearing, like the capital sentencing hearing, is itself a trial on eligibility for a harsher sentence, and therefore constitutes jeopardy.

*Id*. at 1033 (citations omitted).

¶73. *DeBussi,* however, does not stand for the "double jeopardy" proposition Snow asserts. The gravamen of that holding was that it violates the double jeopardy clause to allow the State to allege habitual status, attempt to prove that allegation, fail to do so and yet attempt again to prove such allegation in another trial or hearing in the same cause. *See id*., citing *Cooper v. State*, 631 S.W.2d 508, 513-14 (Tex. Crim. App. 1982).

¶74. The holdings of this Court, rather, dictate that -- if a capital murder defendant is indicted as a habitual offender -- the trial court must conduct a hearing on the habitual offender portion of the indictment prior to the sentencing phase, in which the jury considers whether to sentence the defendant to death. The reason for this procedure was to allow a defendant to inform the jury that as a habitual offender, the defendant could be sentenced to life imprisonment without the possibility of parole, as opposed to being sentenced to death. *Taylor v. State*, 672 So.2d 1246, 1272-73 (Miss. 1995); *Russell v. State*, 607 So.2d 1107, 1118-19 (Miss. 1992); *Hansen v. State*, 592 So.2d 114, 144 (Miss. 1991); *Ladner v. State*, 584 So.2d 743, 758-59 (Miss. 1991); *Mackbee v. State*, 575 So.2d 16, 38-41 (Miss. 1990); *Berry v. State*, 575 So. 2d 1, 13-14 (Miss. 1990); *Turner v. State*, 573 So.2d 657, 673-75 (Miss. 1990).

¶75. This assignment of error is without merit.

<h1 style="text-align:center">IX.</h1>

¶76. Over Snow's objection, the trial court included a "great risk" aggravator in the jury instructions. Snow argues the aggravator was not supported by sufficient evidence because his actions were aimed only at the two(2) police officers. Because Gholar, the other witness in the police vehicle, was unharmed and none of the three (3) witness who drove upon the scene, were injured, nor was there any evidence that Snow took any action against these individuals or any other individuals, who may have come upon the scene. The court's ruling to the contrary, Snow concludes, was error. We disagree.

¶77. Miss. Code Ann. § 99-19-101(5)(c) provides that a defendant must have "knowingly created a great risk of death to many persons." In upholding the aggravator, we have said that to restrict its use to those crimes where a very large number of individuals were at risk or to where the safety of those, other than an intended few, is jeopardized would be to limit the statute beyond its intended scope. *Jackson v. State,* 672 So. 2d 468, 490 (Miss. 1996) (finding the aggravator warranted where a defendant stabbed four children and one adult to death, and inflicted life-threatening stab wounds on two other children). The risk must be to someone other than the intended victim. *Porter v. State,* 732 So. 2d 899 (Miss.1999). (evidentiary basis insufficient where a defendant, hired to kill the victim, hid outside the doorway of the victim's home and shot him when he came to the door, fleeing afterwards despite the fact that there were other person in the house).

¶78. The circumstances here are not analogous to any of the our previous examinations of the "great risk aggravator."[(6)] Other jurisdictions construing the same statutory language however, have affirmed the aggravator in similar circumstances. In *Delap v. State,* 440 So. 2d 1242 (Fla. 1983),[(7)] for example, sufficient evidence existed that a defendant knowingly created a great risk of death to many persons where

the defendant drove erratically down the highway while struggling with the victim. This was so, even though apparently no one other than the victim was immediately present during the murder. *Id* at 1257. Observing that numerous vehicles were on the highway, the court reasoned that the defendant should "reasonably have foreseen that his erratic driving and possible loss of control of the car could have caused a crash or otherwise endangered many persons." *Id.*

¶79. Sufficient evidence also existed to support the aggravating circumstance where a defendant fatally shot a train engineer as the train, manned by a conductor and trainman located at is rear, was backing along the track through a residential area and approaching a set of parked railroad cars. *Magwood v. State,* 494 So. 2d 124 (Ala. Crim. App. 1985). When the defendant shot the unsuspecting engineer from behind, the latter fell forward on the throttle and pedal, causing the train to lurch and accelerate. *Id.* at 146. Even though no one but the engineer was injured, threatened, aimed at or shot, the court explained, the lives of the conductor and trainman were in jeopardy and it would be illogical to conclude that the defendant did not know that leaving "*pilotless a moving force* having the great weight of a train, in a populated area, would create a great risk of death to many persons who happened to be in its path." *Id.* (emphasis added). Thus, the great risk aggravator contemplates more than a showing of some degree of risk to a few persons. To pose a great risk, there must be a high probability of danger, not a mere possibility.

¶80. This record reflects that after being shot by Snow, the driver, Deputy Bourne, slammed or slumped over on the brake pedal forcefully enough to thrust the hood of the car downward and emit blue smoke from the tires. The car was still moving when Snow escaped through the driver's side window. Instead of leaving, Snow ran along beside the car, dove back in the car window, and shot several more times. Fragments of spent ammunition were later found throughout the inside of the vehicle.

¶81. There were also other vehicles in close proximity to the patrol car when the shootings occurred. Tom Wilder was traveling in the opposite direction of the patrol car when he saw it skid, Snow climb out of the driver's window and dive back in, and fire several more shots. Another witness, Joe Stonger, was traveling on the highway that day when he saw Wilder's vehicle traveling in reverse gear toward him and saw the officers' car smoking, slowing, and rolling off the road. When he realized he was close enough to be shot, he turned his vehicle around and went to a nearby establishment to call police.

¶82. Snow shot the driver of a patrol car, risking that the car would go out of control, endangering its occupants and the occupants of the other vehicles on the road, and risking that a bullet would ricochet and hit one of the occupants of the patrol car, or someone outside the vehicle. A jury could find that Snow's actions imperiled the lives of others.[8] The fact that Ms. Gholar and other witnesses who happened upon the scene were not actually injured is immaterial. We hold the trial court did not err in submitting this aggravator to the jury.

## X.

¶83. On July 27, 1998, a few days before his trial was scheduled to start, Snow's lead counsel and counsel on appeal, Michael Adelman, filed a Motion for Leave to Withdraw as Attorney of Record. Long before filing the motion, however, counsel advised the court that Snow was not cooperative and that he was having difficult preparing an effective defense. In the Motion to Withdraw, counsel asserted that on July 21, 1998, Snow advised him that he no longer wanted his services as his attorney, because he was a racist and Mr. Adelman was Caucasian. Snow, according to the motion, also expressed extreme hostility towards and did not communicate with co-counsel, an African-American female, who joined in the motion.

¶84. The trial court denied both moth motions to withdraw and appointed an African-American male attorney, Richard Burdine, as additional counsel. Counsel contends, nevertheless, that while certainly an indigent defendant does not have an absolute right to the appointed attorney of his choice, *see Smith v State*, 724 So. 2d 280 (Miss. 1998), an indigent defendant is guaranteed an effective advocate. Snow counsel maintain that the court, in turning a deaf ear to their repeated concerns, therefore ultimately denied Snow his full right to counsel under the Sixth Amendment.

¶85. We do not find that Snow was denied effective assistance of counsel. A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. *Manning v. State*, 735 So. 2d 323, 346 (Miss. 1999) (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984)). First, the defendant must show that counsel's performance was deficient, which requires showing that counsel made errors so serious that he/she was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. *Id.* Second, the defendant must show that the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial with a reliable result. To satisfy the first prong, the defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy." *Manning*, at 347 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955) ). To satisfy the second prong, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

¶86. Snow has satisfied neither prong here. He does not cite to any instance in the record where his counsel was deficient, challenge any action as unsound trial strategy or unprofessional error, nor demonstrate any resulting prejudice. Snow's counsel, in filing numerous pretrial and post-trial motions, including a successful Motion to Quash the Special Venire selected in Lauderdale County, Mississippi, suggests counsel's conduct was both reasonable and professional. Furthermore, the trial court's attempt to appeal to Snow's preferences by selecting an attorney, both African-American and male, contravenes Snow's assertion that it turned a deaf ear. Snow's Sixth Amendment right to counsel was not violated.

## XI.

¶87. Next, Snow argues that statements he made to two different officers should have been suppressed because they were obtained through trickery and after he had invoked his right to counsel. Determining whether a confession is admissible is a finding of fact which is not disturbed "unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence." *Lee v. State*, 631 So.2d 824, 826 (Miss.1994) (quoting *Balfour v. State*, 598 So.2d 731, 742 (Miss. 1992)).

### a. Statements to Officer Wood

¶88. The record reflects that following Snow's apprehension by authorities, Officer Tim Wood of the Mississippi Highway Patrol (MHP) arrived at the parking lot behind the Mendenhall Jitney Jungle grocery store, where Snow was in custody and sitting in the backseat on the passenger side of a marked patrol car of another agency.[(9)] The car had a partition separating the front and back seats. Wood had been told to take charge of Snow, and was awaiting instruction as to whether Snow would be moved to a MHP vehicle.

He stood near the rear passenger door in order to prevent the door from being opened. When it was determined that Snow would be taken into MHP custody, he was moved to an unmarked MHP vehicle completely naked, except for the restraints on his hands and legs. As soon as Snow was placed in the backseat of the driver's side of the MHP car, Wood walked around to the passenger side of the car and entered the backseat with Snow. Wood closed the door, and he and Snow were alone in the car. Approximately one to two minutes after Wood got in the car, Snow said, "***What are they going to do to me for this***?" According to Wood's testimony, the following exchange then occurred:

> Q: And then what did you do?
>
> A: I- I advised him of his Miranda rights.
>
> Q. And what are those rights for the jury, please?
>
> A. You have a right to remain silent. Anything you say can and will be used against you in a court of law. You have a right to an attorney. If you cannot afford an attorney, one will be appointed for you at no cost. Do you understand your rights? And the prisoner applied [sic] "Yeah. Okay then."
>
> Q: Then what happened?
>
> A: And at that time- I said, "***Shooting those deputies sure was stupid thing for you to do.***"
>
> He said, "***It sure was'***, and shook his head yes.'"

¶89. The statements, "What are they going to do me for this?" and "It sure was" should have been suppressed, Snow argues. While Officer Wood did not initiate questioning, clearly he was in custody at that point and Officer Wood should have given him his ***Miranda*** rights as soon as the two of them were alone in the patrol vehicle. This situation was designed to pressure Snow because there was no other purpose for Officer Wood to sit in the backseat alone with Snow, who except for a pair of boots, remained nude. Even assuming that Snow's first statement was admissible, he maintains his second statement, "It sure was," should have been suppressed. Although the Officer had given him his ***Miranda*** warnings, he did not waive his rights. Officer Wood, he argues, simply gave the ***Miranda*** warnings and then proceeded to question Snow without inquiring as to whether he agreed to waive those rights, citing ***Abram v. State***, 606 So. 2d 1015 (Miss. 1992); ***Powell v. State***, 540 So. 2d 13, 16 (Miss. 1989).

¶90. The State insists that Wood had no intent to question Snow but simply intended to safely transport him to the Rankin County Correctional Facility. He only got in the back seat with him, because unlike the car of the other agency, no partition separated the front and back seats of the MHP car. With regard to Snow's second statement, the State insists it's not error to use statements against a defendant who does not heed his Miranda warnings.

¶91. An officer's subjective intent in making the comment, as emphasized by the State here, is not the issue. ***Rhode Island v. Innis***, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297(This portion of the definition of interrogation focuses primarily upon the perception of the suspect, rather than the intent of the police.). *See **Arizona v. Mauro***, 481 U.S. 520, 527, 107 S. Ct. 1931, 1935, 95 L. Ed.2d 458 (1987); ***Innis***, 446 U.S. at 301-02 n. 7, 100 S. Ct. at 1690 n. 7). It is a factor, at best, simply to be considered. ***United States v. Soto***, 953 F.2d 263, 265 (6th Cir.1992) (noting that the "[a]bsence of intent to interrogate, while not irrelevant, is not determinative of whether police conduct constitutes interrogation"). The question is,

rather, whether the officer should have known his actions or statements were reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 301.

¶92. Snow was clearly in custody when Officer Wood arrived at the scene. Because there were no questions asked, the issue is whether Wood's conduct was the functional equivalent of interrogation. Arguably, it was. Although Snow "initiated" the conversation with his first statement to the officer, an argument could be made that the officer should have known that his actions-getting in the car alone, into the backseat, with a handcuffed and completely naked Snow and recent manhunt target, and then remaining silent for "one to two minutes" is conduct creating an atmosphere which might compel Snow to make an incriminating statement. This is a factual issue however, and the trial court's finding to the contrary that his first statement because it was voluntary and the officer's conduct was not interrogation, is not clearly erroneous. *See Innis*, 446 U.S. at 300.

¶93. With regard to the second statement, it is certainly reasonable, that the officer should have known that commenting to Snow that "Shooting those deputies sure was a stupid thing for you to do"[(10)] would likely elicit a response, as *Innis* not only prohibited express but implied questioning as well. Whether he intended or anticipated that Snow would respond, as the State emphasizes, again is not dispositive. The "primary focus" is upon Snow's perceptions of Wood's statement, not Wood's intent in making the statement. *Id.* at 291. Further, the second statement was clearly not in response to routine investigatory questions as in *Greenlee v. State*, 725 So. 2d 816, 825 (Miss. 1998), cited by the State where an officer asked a 15-year-old defendant where he was staying and where his parents were, and Snow did not approach Officer Wood at the scene and confess to the shooting as in *Luster v. State*, 515 So. 2d 1177 (Miss. 1987), also cited by the State. Though, in attempting to establish an implicit waiver, the State makes much of the fact that the defendant initiated the conversation, that fact alone, "does not end the inquiry. . . The 'totality of the circumstances' must still be considered in determining whether the purported waiver was knowing and intelligent. The burden is a heavy one and on the government." *United States v. Montgomery*, 714 F.2d 201 203 (1st Cir. 1983) (quoting *Miranda*, 384 U.S. 436, 475, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (the right to remain silent may be voluntarily waived, provided that waiver is made knowingly and intelligently)).

¶94. To determine whether the waiver was knowing and intelligent, we must consider the suspect's 1) age, education, and intelligence, (2) the extent of his previous experience with the police, (3) the repeated and prolonged nature of the questioning, (4) the length of the detention of the accused before he gave the statement in question, (5) the lack of any advice to the accused of his constitutional rights, (6) whether the accused was deprived of food, sleep, or medical attention, and (7) whether the suspect was threatened with abuse. *Miranda,* 384 U.S. at 468-70, 86 S. Ct. at 1624-25.

¶95. The record reflects that Snow was twenty years old at the time of the incident, and had completed an eleventh grade education. Conflicting testimony was put on concerning his competency, but in evaluations to determine his intelligence, he was generally uncooperative with both defense and state experts. He did, however, demonstrate an understanding of legal proceedings and, obviously, he had previous experience as he was a previous offender and was on his way to jail when the incident happened. There is no evidence concerning the remaining factors.

¶96. The record supports the conclusion that Snow voluntarily, knowingly, and intelligently waived his rights when he making the statement "It sure was."

## b. Statements to Officer Langraf

¶97. Snow's argue that two statements made to Officer Langraf at the Rankin County Correctional Facility also should have been suppressed. The record reflects that Mississippi Highway Patrol Officers, Andy Langraf and Larry Luke, attempted to question Snow after he arrived at the Rankin County Correctional Facility. They videotaped the explanation of rights to Snow to which he indicated that he did not want to give an interview without his lawyer present.[11] The officers testified they then "shut down" the interview and left the interrogation room. At the suppression hearing, the testimony on the matter was as follows:

Q: Okay. After you shut the interview down, what did you do then?

A: Myself and Investigator Luke stood up. *We walked outside of the interview room and stood right outside the door of the interview room, and I was standing there, and I started talking to a Mendenhall police officer and questioning about the clothing of Eric Snow, had we found the clothing yet* and- you want me to go further?

Q: Yes, sir.

A: Okay I was standing there questioning about the clothing, and all of a sudden, Eric Snow volunteered, spoke out, said *'I'll tell you where my clothes- where I dropped my clothes.'*

Q: All right. Were you directing these comments about the clothes to Mr. Snow?

A: No, sir. I was out of the room about two to three feet away.

* * *

Q: What did you do then?

A. I turned and went back to the interview room and I looked at him. I was standing over him, and I just said, *"Where"?* And he proceeded to tell me.

Q: All right. Where did he tell you?

A: *He said across from where the car was at across the road. There was little cleared out spot. Go through the cleared out spot down across the fence out in the field a little ways. He said when you get to the water, that's where I dropped them, in the water.*

Q: All right. And did you at that time attempt to question him any further.

A. No.

* * * *

Q: Okay. Did you then relay this information to other officers that Mr. Snow had given to you?

A: Yes, sir. I immediately left the interview room and went to the telephone and called the Mendenhall P.D. and let the dispatcher know it to relay it on to some officers out that could have been on the search to try to go retrieve the clothes.

Q: And were the clothes later recovered?

A: Yes, sir, they were.

Q: Okay. And after you gave this information to the Simpson County authorities over the phone, what did you then do?

A: Went back over towards the interview room and was standing there and turned back around and looked at Eric Snow and asked him a question.

Q: What did you ask him?

A: I asked him, '*What about the gun? Where did you get the gun?"*

Q: And what, if anything, did he say?

A: He looked down at the floor and proceeded telling me. *He said there was a holster-a black holster sitting on the arm rest. He took the gun out of the holster, put the holster up under the armrest, and then he wouldn't make any more statements*."

(emphasis added).

¶98. The trial court suppressed Snow's response to the gun question, but denied his motion as to the statements concerning the location of his clothes. This was error, Snow argues, because the testimony regarding the discovery of his clothes constituted "fruit of the poisonous tree." Although Officer Langraf "terminated" questioning after Snow invoked his right to a lawyer, he continued to talk about the missing clothes with at least one (1) other police officer within earshot of Snow. He then immediately left the interview room and called the Mendenhall Police Department, in order to get this information to the dispatcher there. This was a ploy, he charges, similar to that of Officer Wood and the statements should have been suppressed.

¶99. The trial judge's ruling was that Snow had volunteered this information, and therefore the statement was admissible. The statement itself, however, was not introduced at trial. Another officer of the Mendenhall Police Department, rather, testified that he found the clothes near the scene of the crime. The State agues, therefore, that Snow didn't establish that the clothes were found as the result of the statement made to the Officer. The officer's actions, furthermore, were not the "extreme coercion" which existed in *Arizona v. Fulimante,* 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) as Officer Langraf was conversing with another officer and was "not even considering Snow at the time." It was Snow, clearly, the State argues, who initiated the conversation.

¶100. While it is well established that an accused person can waive his right to counsel by initiating conversation with law enforcement, *Hunter v. State*, 684 So. 2d 625, 632 (Miss. 1996), included in the inquiry is whether statements were made in response to the functional equivalent to interrogation.[(12)] *United States v. Barlow*, 839 F. Supp. 63 (D. Me. 1993). Courts considering whether a conversation between officers in the suspect's presence is the functional equivalent to interrogation, examine whether the comments were directed towards the accused and were designed to elicit a response. *Innis*, itself, for example, raised the issue and the Court found that the conversation between the officers was nothing more than a dialogue between them, to which no response from the respondent was invited. The police did not

carry on a "lengthy harangue" in the presence of the suspect, the comments were" not particularly evocative", and nothing suggests that they were aware that the suspect was "peculiarly susceptible to an appeal to his conscience" concerning the safety of handicapped children. While it may be said that the defendant was subjected to a "subtle compulsion", it was not established that the suspect's response was the product of actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response. *Innis* at 1690-91. *See also* **United States v. Roman-Zarate,** 115 F.3d 778, 782 (10th Cir. 1997) (not functional equivalent of interrogation when agent, in suspect's presence, asked other agents if suspect had invoked right to remain silent as question was attendant to custody); **Barlow**, 839 F. Supp. at 64-68 (words and actions of federal agents, who stood comparing handwritten notes found in defendant's house during search with copy of letter that they had brought with them to house, were not functional equivalent of interrogation; officers' discussion was not directed towards defendant, since agents had their backs turned toward defendant and were four to six feet from defendant.). **People v. Jumper,** 447 N.E.2d 531 (Ill. App. Ct. 1983) (finding no response was invited where an officer, in defendant's presence, informed another officer that the defendant had attacked him, and defendant made an incriminating response that was admitted)).

¶101. Because their comments were not directed toward Snow and they stood at the door, approximately two feet away with their back towards him, we cannot conclude that the trial court's ruling was erroneous. *See* **Barlow,** 839 F. Supp. at 67. Snow's statement, "I'll tell you where my clothes-where I dropped my clothes," thus, was voluntary. With regard to his response to Officer's Langraf's question, "Where?" this could be considered a "follow-up" to clarify what was said as it was asked in response to a voluntary statement.[(13)] Some courts have held that police officers asking follow-up questions merely continue the flow of a conversation initiated by the defendant.[(14)] When, at some point, an officer's follow-up question "begins to exert pressure" it becomes interrogation "made to confirm a defendant's guilt" and should cease.[(15)] Other courts appear to suggest that officers should inform the suspect of his or her *Miranda* rights before asking follow-up questions to a voluntary statement, adhering closely to *Innis*. The reasoning being that once the officers "reasonably suspect" that incriminating information will be forthcoming, *Miranda* warnings must be given.[(16)] We do not find it necessary to decide the admissibility of this statement because the statement itself ultimately, was not admitted in trial.

## XII.

¶102. Lastly, Snow asks the Court to reverse the court's denial of his Motion to Strike and Quash as Unconstitutional the Mississippi Statues Providing for Imposition of the Death Penalty and to Strike the Demand for the Death Penalty in This Cause. He argues the Mississippi death penalty constitutes cruel and unusual punishment for all of the reasons set forth by the United States Supreme Court in **Furman v. Georgia**, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), as such punishment is "inconsistent with the fundamental premise. . . that even the vilest criminal remains a human being possessed of common human dignity." **Furman**, 33 L. Ed. 2d at 368. It cannot be administered without unfairness, inequity and capriciousness. Death is a final, permanent, irrevocable-in short, a "perfect"-- punishment, and neither trial courts, prosecuting attorneys nor defense attorneys are capable of providing a perfect trial for any defendant, let alone a defendant in a capital murder case.

¶103. The death penalty has been held to be a constitutional method of punishment by the United States Supreme Court and the Mississippi Supreme Court. *See* **Gregg v. Georgia**, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); **Proffitt v. Florida**, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913

(1976); *Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976). *See also Walker v. State*, 740 So.2d 873, 889-90 (Miss. 1999); *Puckett v. State*, 737 So.2d 322, 363 (Miss. 1999); *Johnson v. State*, 476 So.2d 1195, 1201-02 (Miss. 1985); *Jordan v. State*, 464 So.2d 475, 482-83 (Miss. 1985); *Jones v. State*, 461 So.2d 686, 691 (Miss. 1984); *Billiot v. State*, 454 So.2d 445, 464 (Miss. 1984); *Williams v. State*, 445 So.2d 798, 809 (Miss. 1984); *Edwards v. State*, 441 So.2d 84, 90 (Miss. 1983); *Bullock v. State*, 391 So.2d 601, 611 (Miss. 1980); *Coleman v. State*, 378 So.2d 640, 647 (Miss. 1979); *Irving v. State*, 361 So.2d 1360, 1367 (Miss. 1978). We are bound by these authorities.

## XIII.

## PROPORTIONALITY REVIEW

¶104. In accordance with the mandate of Miss. Code Ann. § 99-19-105(3)(c), this Court shall determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Where the sentence is found to be disproportionate, this Court may set the sentence aside and remand the case for modification of the sentence to life imprisonment. *Id*. This Court has reviewed the record to compare Snow's case with other capital murder cases in which this Court has entered a final judgment as set forth in Appendix A. Considering the aggravating and mitigating circumstances presented herein, when weighed against those of other capital murder cases, we are of the opinion that the death penalty in Snow's case is neither disproportionate nor excessive.

¶105. The case of *Hansen v. State*, 592 So.2d 114 (Miss. 1991), provides a factual basis upon which a proper comparison of sentences may be made. Hansen was convicted of capital murder for the death of David Bruce Ladner, an eighteen year veteran of the Mississippi Highway Patrol. While on duty, Ladner observed a vehicle driven by Hansen driving erratically along a Mississippi public highway. When Ladner pulled Hansen over, he noticed that Hansen had begun to act suspiciously. Ladner then requested Hansen's consent to search the car. At some point shortly thereafter, Hansen pulled out a .38 calabur handgun and fired a shot at Ladner. Ladner ran to the other side of the car and attempted to roll underneath. Ladner was shot twice in the back by Hansen and would later die from his injuries. The jury found that Hansen had shot Ladner **for the purpose of avoiding or preventing lawful arrest, or effecting an escape from capture**, *Id.* at 122, and sentenced him to die. *Id.* This Court considered the punishment imposed in Hansen's case, compared it to other death penalty cases and determined that Hansen's death sentence was proportionate to the penalty imposed. *Id.* at 154. Here the defendant, Snow, was already in the custody of two officers who were transporting him to the Rankin County Correctional Facility. Their subsequent murders constituted a deliberate attempt by Snow to escape from that custody. There exists no basis for finding Snow's sentence disproportionate to Hansen's under the circumstances.

## XIV.

¶106. For the reasons discussed herein, the judgment is affirmed.

¶107. **CONVICTION OF TWO COUNTS OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED. CONVICTION OF ESCAPE AND SENTENCE OF FIVE YEARS WITHOUT PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS A HABITUAL OFFENDER, AFFIRMED.**

**PITTMAN, C.J., McRAE, P.J., SMITH, MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR.**

<u>APPENDIX</u>

<u>DEATH CASES AFFIRMED BY THIS COURT</u>

*Stevens v. State*, So.2d (Miss. 2001).

*Mitchell v. State,* -- So.2d -- (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

## DEATH CASES AFFI RMED BY THIS COURT

### (continued)

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi,*** 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State***, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi***, 494 U.S. 1075 (1990) vacating and remanding ***Pinkney v. State***, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State***, 517 So. 2d 1295 (Miss. 1987)**,** ***Jones v. Mississippi***, 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss. 1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).


## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

### (continued)

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## ON SENTENCING PHASE ONLY

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

\**Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990)

vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

**\*Jones v. State**, 517 So. 2d 1295 (Miss. 1987), **Jones v. Mississippi,** 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

**Russell v. State**, 607 So. 2d 1107 (Miss. 1992).

**Holland v. State**, 587 So. 2d 848 (Miss. 1991).

**Willie v. State**, 585 So. 2d 660 (Miss. 1991).

**Ladner v. State**, 584 So. 2d 743 (Miss. 1991).

**Mackbee v. State**, 575 So. 2d 16 (Miss. 1990).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## ON SENTENCING PHASE ONLY

### (continued)

**Berry v. State**, 575 So. 2d 1 (Miss. 1990).

**Turner v. State**, 573 So. 2d 657 (Miss. 1990).

**State v. Tokman**, 564 So. 2d 1339 (Miss. 1990).

**Johnson v. State**, 547 So. 2d 59 (Miss. 1989).

**Williams v. State**, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

**Lanier v. State**, 533 So. 2d 473 (Miss. 1988).

**Stringer v. State**, 500 So. 2d 928 (Miss. 1986).

**Pinkton v. State**, 481 So. 2d 306 (Miss. 1985).

**Mhoon v. State**, 464 So. 2d 77 (Miss. 1985).

**Cannaday v. State**, 455 So. 2d 713 (Miss. 1984).

**Wiley v. State**, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, **Wiley v. State**, 484 So. 2d 339 (Miss. 1986), *cert. denied* **Wiley v. Mississippi**, 479 U.S. 1036 (1988); resentencing ordered, **Wiley v. State,** 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to **Wiley v. Puckett**, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, **Wiley v. State**, 95-DP-00149, February 13, 1997 (rehearing pending).

**Williams v. State**, 445 So. 2d 798 (Miss. 1984).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

1. Snow does not address any separate issues regarding his escape conviction. Accordingly disposition of that part of the judgment below must follow disposition of the guilt phase issue which would affect both the escape conviction and the capital murder convictions.

2. The State also used two more of its peremptory challenges during the selection of alternate jurors. One was used against an African-American person, the other was used against an Caucasian individual.

3. In *Stringer* this Court held that the errors that merited reversal were: 1) prosecutorial display of photographs at trial and of slides during closing arguments of a separate victim, not the victim in the present case; 2) prosecutor's attempt to prevent co-defendant from being called as a witness; 3) prosecutorial elicitation of promises during voir dire to exclude certain mitigating factors and reminder during closing arguments of that promise; 4) prosecutorial comment that this was the jury's "last chance" to sentence the defendant to death; and, 5) prosecutorial comment on defendant's failure to testify.

4. Snow objected to State's Exhibits 32-38.

5. Miss. Code Ann. § 99-19-81 reads as follows:

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.

6. *See* ***McGilberry v. State***, 741 So.2d 894 (Miss. 1999) (evidence in capital murder prosecution supported jury's finding of aggravating circumstance of creating a great risk of death to many persons, committing capital offense for pecuniary gain during the course of a robbery, and capital offense that was especially heinous, atrocious or cruel; defendant bludgeoned his step-father, mother sister and three-year-old nephew with baseball bat, and stole a car, some cash, a money order, and a credit card.); ***Porter v. State***, 732 So.2d 899 (Miss. 1999) (evidence was insufficient to support jury instruction on aggravating circumstance of whether capital murder defendant knowingly created great risk of death to many people; defendant and co-defendant were hired to kill victim, they went to victim's home on a Saturday morning, several cars were parked in driveway, defendant hid outside doorway of victim's home, and when victim came to the door, defendant shot him and ran. (Per Prather, P.J., with two Justices concurring, one Justice concurring in the result, and two Justices concurring specially.)); ***Jackson v. State***, 684 So.2d 1213 (Miss. 1996). Capital murder aggravating circumstance, that defendant knowingly created a "great risk of death to many persons," applied to defendant who stabbed four children to death and inflicted life-threatening stab wounds on one adult and another child. ***Jackson v. State***, 672 So.2d 468 (Miss. 1996), republished as corrected at 684 So.2d 1213. *See also* ***Wheeler v. State,*** 536 So. 2d 1341, 1343 (Miss. 1988) where the Court said by seizing the officer's gun and firing it (according to the most generous possible interpretation) recklessly and at random, the defendant engaged in the type of conduct contemplated by § 97-3-19(1)(b). "In fact, the jury practically found as much during the sentencing phase, listing among the aggravating circumstances the fact hat Wheeler "knowingly created a ***great risk*** of death to many persons."

7. The Florida statutes reads: "The defendant knowingly created a great risk of death to many persons." F.S.A. § 921.141(5)(c).

8. *See State v. Burns,* 979 S.W.2d 276 (Tenn. 1998)(evidence supported finding aggravating circumstance that defendant knowingly created great risk of death to those other than victim where defendant fired his weapon inside car in which three people were sitting, killing one and wounding another, then fired shots at another man who fled from the car, and ***those shots directly imperiled four young men playing basketball in a nearby driveway***) (emphasis added).

9. We note that whether the agency that had custody of Snow prior to Officer's wood's arrival had given him his *Miranda* rights is not in the record. No officers from the other agency testified at trial, and although the record reflects that Snow's counsel attempted to cross-examine on this very point, Officer's Wood recollection was vague.

10. Commentators have noted that difficulties arise, however, in cases in which police have evoked incriminating statements by conduct that can be deemed to have some purpose other than to elicit a response. There is a plausible argument that an objective observer could conclude that the officer's remarks were made out of genuine concern. The danger is that in the interrogation context courts sympathetic to police interrogation can always find some other purpose for an officer's actions. *See* Jonathan L. Marks, Comment, *Confusing the Fifth Amendment with the Sixth: Lower Court Misapplication of the Innis Definition of Interrogation*, 87 Mich. L. Rev. 1073 (1989).

11. We note that Snow had been sentenced earlier that day for an unrelated crime and so apparently had an attorney.

12. The Supreme Court has mandated that once a defendant has invoked his right to an attorney, all questioning by law enforcement officers must cease until an attorney is present. *Miranda*, 384 U.S. at 474. A defendant who has invoked his right to counsel, as Snow did here, may not be subject to further interrogation unless he initiates the communication, but a "a valid waiver . . . cannot be established by showed only that he responded to further police-initiated custodial interrogation." *United States v. Giles*, 967 F.2d 382, 385 (10th Cir. 1992) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)).

13. *State v. Lamb*, 330 N.W.2d 462, 466 (Neb. 1983). In *Lamb*, the defendant, while in custody, asked a police officer, 'How would you like it?' When the officer responded, 'What do you mean by that?,' the defendant answered 'I have to do the cooking, washing, the laundry. And I got tired of it . . . so I shot her.' 330 N.W.2d at 465. The officer's question was not considered interrogation because it simply requested a clarification of the defendant's initial statement. 330 N.W.2d at 466.

*State v. Longley,* 483 A. 2d 725 (Maine 1984) (no Miranda rights were given where defendant approached officer and made voluntary statement; held evidence from general investigations is admissible in absence of Miranda warnings and include neutral impersonal requests for information and follow-up questions for the purpose of clarifying an ambiguous situation, such as: "What about it?; "What do yo think? "; "what happened?"; and "What do you want to do about that now?");

*See, e.g.*, *State v. Porter*, 281 S.E.2d 377, 385 (NC 1981). In *Porter*, the arresting officer radioed his supervisor to inform him of defendant's apprehension. The supervisor asked if the officer had recovered the

stolen bank bag. The defendant overheard the question and stated 'The bank bag is in the car.' When the officer asked 'What bank bag?', defendant replied 'The bag from the robbery.' Porter, 303 N.C. at 683, 281 S.E.2d at 385. Since the officer's question only sought clarification, it was not interrogation.

14. *Id.*

15. *See, e.g.*, **People v. Bodner**, 27 Crim. L. Rep. (BNA) 2414 (July 10, 1980). In **Bodner**, the defendant came to the police and told them that his cousin had committed the crime. After speaking to the cousin, a police officer informed the defendant that he believed the cousin's version of the facts and defendant confessed. The court found the confession inadmissible as the officer's statements constituted interrogation. Rather than a 'neutral effort' to clarify what had been said, the policeman's statement was considered a 'confrontation'--an accusation of lying--designed to close in on the suspect. 27 Crim. L. Rep. (BNA) at 2415. Since the suspect could sense increased government pressure, the conduct became interrogation. As both **Miranda** and **Innis** stated, to posit the guilt of the suspect is a form of interrogation. *See* **Innis**, 446 U.S. at 299 (quoting **Miranda**, 384 U.S. at 450); **Stave v. Gravel**, 601 A. 2d 678 (N.H. 1991) (Evidence supported conclusion that defendant was interrogated for Miranda purposes while he was being transported from police station to county jail; although defendant opened dialogue by asking if there would be a doctor at the jail, it was trooper who shifted direction and altered character of conversation concerning defendant's drug use; while officer's initial inquires into type of drug used, method employed, and amount ingested were follow up questions germane to determining whether medical care would be required, subsequent questions pertaining to location where drug was used sought only to elicit incriminating evidence, and thus constituted interrogation).

16. **Merriweather v. State,** 629 So.2d 77, 83-84 (Ala.Crim.App.1993) (defendant arrested made voluntary statements to a separate crime of murder; held person who volunteers facially exculpatory information and the police have no reason to consider a suspect, may, without being advised of his Miranda rights, be asked follow-up questions so long as those questions are designed to clarify the statement, but once the police believe that any further questions would be "reasonably likely to elicit an incriminating response," they must administer the Miranda warnings before [asking] any follow-up questioning, citing **Rhode Island v. Innis**, 446 U.S. 291). *See also* **United States v. Gonzalez**, 688 F. Supp. 658, 662 (D.D.C. 1988), *remanded on other grounds*, 875 F.2d 875 (D.C. Cir. 1989) ( defendant made voluntary statements during search; officer then advised defendant of his Miranda warnings and defendant continued to make voluntary statements and officer asked questions; held "Miranda does not apply to unsolicited, spontaneous and voluntary statements, not made in response to interrogation, although officers must give warnings before any follow-up questioning is resumed.", citing **Rhode Island v. Innis**, 446 U.S. 291 (1980); **State v. Risk,** 598 N.W. 2d 642 (Minn. 1999) (defendant was given Miranda warnings and said "I need to call my lawyer today"); held police officers must cease custodial interrogation once the accused makes an ambiguous or equivocal statement that could reasonably construed as invocation of the right to counsel, except for narrow questions designed to clarify the suspect's true desires regarding counsel, and may resume questioning only if their narrow follow-up questions clarify that the accused is not expressing a desire to deal with the police through counsel.